M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
Brandon P. Jack (SBN 325584)
**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
*aberry@justice4you.com*
*gharoutunian@justice4you.com*
*bjack@justice4you.com*

Thomas J. McKenna*
*tjmckenna@gme-law.com*
Gregory M. Egleston*
*gegleston@gme-law.com*
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300

*Pro Hac Vice Forthcoming*

*Counsel for Plaintiff Joseph Fernicola*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH FERNICOLA, Derivatively on Behalf of C3.AI, INC., | Case No. |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| THOMAS M. SIEBEL, HITESH LATH, CONDOLEEZZA RICE, RICHARD C. LEVIN, MICHAEL G. MCCAFFERY, BRUCE SEWELL, LISA A. DAVIES, JIM H. SNABE, STEPHEN M. WARD, JR., KR SRIDHAR, ALAN MURRAY, GEN. JOHN HYTEN (RET.), and KENNETH A. GOLDMAN, | |
| Defendants, | **JURY TRIAL DEMANDED** |
| and, | |
| C3.AI, INC., | |
| Nominal Defendant. | |

Plaintiff Joseph Fernicola ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of C3.AI, Inc., ("C3," or "C3 AI," or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").   Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state law that have caused substantial harm to the Company.

2.      The Individual Defendants (defined below) provided investors with material information concerning C3's ability to perform in spite of its Chief Executive Officer's health situation and in providing expected revenue for the first quarter and full fiscal year 2026. The Individual Defendants' statements included, among other things, assurances that Chief Executive Officer, Defendant Thomas M. Siebel, was in sufficient health to effectively conduct his role, without any indication his health or the necessary accommodations utilized could jeopardize financial growth or the Company's ability to close deals. The Individual Defendants' statements further confidently discussed C3's market opportunity, the demand for its products, and its ability to execute and capitalize on the growth opportunity before it.

3.      The Individual Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of C3's growth; notably, that its Chief Executive Officer health was having a significant impact on the Company's ability to close deals,

that its management was unable or otherwise ineffectual in minimizing that impact, and that C3 would not be able to execute upon its profit and growth potential as a result.

4.      On August 8, 2025, C3 announced disappointing preliminary financial results for the first quarter of fiscal 2026 and reduced its revenue guidance for the full fiscal year 2026. The Company attributed its poor sales results and lowered guidance on "the reorganization with new leadership" and the health ailments of its Chief Executive Officer.

5.      Investors and analysts reacted immediately to C3's revelation.  The price of C3's common stock declined dramatically.  From a closing market price of $22.13 per share on August 8, 2025, C3's stock price fell to $16.47 per share on August 11, 2025, a decline of about 25.58% in the span of just a single day.

## **JURISDICTION**

6.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation

of fiduciary duties owed to the Company, occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

9.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### THE PARTIES

**Plaintiff**

10.      Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff purchased some of his shares on October 27, 2022, and still holds those shares.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff is a citizen of New York.

**Nominal Defendant**

11.      Nominal Defendant C3 is a Delaware corporation with its principal executive offices located at 1400 Seaport Boulevard, Redwood City, CA 94063. The Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "AI."

**Director Defendants**

12.      *Defendant Thomas M. Siebel* ("Siebel") was, at all relevant times since 2009, the Founder, Chief Executive Officer ("CEO"), and Chairman of the Board of C3.  Upon information and belief, Defendant Siebel is a citizen of California.

13.      *Defendant Condoleezza Rice* ("Rice") was, at all relevant times since September 2020, a director of the Company.  Upon information and belief, Defendant Rice is a citizen of California.

14.      *Defendant Richard C. Levin* ("Levin") was, at all relevant times since August 2010, a director of the Company. Upon information and belief, Defendant Levin is a citizen of Connecticut.

15.     **Defendant Michael G. McCaffery** ("McCaffery") was, at all relevant times since March 2009, a director of the Company.  Upon information and belief, Defendant McCaffery is a citizen of California.

16.     **Defendant Bruce Sewell** ("Sewell") was, at all relevant times since May 2017, a director of the Company.  Upon information and belief, Defendant Sewell is a citizen of California.

17.     **Defendant Lisa A. Davis** ("Davis") was, at all relevant times since December 2021, a director of the Company.  Upon information and belief, Defendant Davis is a citizen of California.

18.     **Defendant Jim H. Snabe** ("Snabe") was, at all relevant times since February 2021, a director of the Company.  Upon information and belief, Defendant Snabe is a citizen of Denmark.

19.     **Defendant Stephen M. Ward, Jr.** ("Ward") was, at all relevant times since January 2009, a director of the Company. Upon information and belief, Defendant Ward is a citizen of Connecticut.

20.     **Defendant KR Sridhar** ("Sridhar") was, at all relevant times since February 2023, a director of the Company.  Upon information and belief, Defendant Sridhar is a citizen of California.

21.     **Defendant Alan Murray** ("Murray") was, at all relevant times since May 2024, a director of the Company. Upon information and belief, Defendant Murray is a citizen of Connecticut.

22.     **Defendant General John Hyten (Ret.)** ("Hyten") was, at all relevant times since October 2024, a director of the Company.  Prior to this, Defendant Hyten served as an advisor to the Company from May 2022 to October 2024.  Upon information and belief, Defendant Hyten is a citizen of Colorado.

23.     **Defendant Kenneth A. Goldman** ("Goldman") was, at all relevant times since May 2025, a director of the Company.  Upon information and belief, Defendant Goldman is a citizen of California.

24.     The above-named defendants are collectively referred to as the "Director Defendants".

**Officer Defendants**

25.    **Defendant Hitesh Lath** ("Lath") was, at all relevant times, the Senior Vice President and Chief Financial Officer ("CFO") of C3. Upon information and belief, Defendant Lath is a citizen of California.

26.    Defendants Siebel and Lath are collectively referred to herein as the "Officer Defendants."

27.    The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## BACKGROUND

28.    C3 is a global artificial intelligence application software company. The Company's C3 agentic AI platform enables customers to design, develop, deploy, and operate enterprise AI applications. Through this platform, the Company offers various targeted AI applications geared toward specific industry and government use cases.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

29.    On February 26, 2025, the Company issued its third quarter fiscal 2025 results. During the question-and-answer portion of the same-day earnings call, Defendant Siebel addressed his recent health concerns and assured investors of his ability to perform in his role during the following pertinent exchange:

> **Citizens JMP Securities Analyst:** Tom, would you be okay talking about the note that you published on February 18? So sorry, but if you could just talk about what the health setback was and what steps you're taking in terms of running the business, I think that would be great.

> **Defendant Siebel:** […] Now as it relates to operating the business, it has so -- Tom has to learn some new skills, and we put the accommodations in place. I mean, you know me to be intimately familiar with the details of this business, okay? And you can imagine that we spent exacting detail with this management team on how we were reorganizing this company around this new opportunity that's here.

> **We've done the same -- we have the same meeting with all of our salespeople around from the world. I spent a lot of time personally with all of the -- a lot of time personally, okay, with all of the partners that we've discussed. I put the**

---

- 5 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*accommodations in place for -- about really the only thing I can't do is read email.*[1]

So the -- so we put the [compensation] in place, there is somebody here with a hot computer, who reads the e-mails to me. I comment, I respond, I approve, I don't prove, what have you. I am here in the office.  I am managing the business every day.

In the short term, my travel, the medical community has me on kind of -- they don't want me going real far or a high altitude.  *And so we've made arrangements for Jim Snabe, who you most certainly know or know of and one of our more distinguished directors.*

Jim, of course, was the Co-CEO of SAP, Chairman of Maersk, Chairman of Allianz, Chairman of [Siemens]. And so Jim assumed the role as a special assistant to the Chief Executive, okay? And he's filling in for the events that Tom can't do. Let's say, I was supposed to be at VivaTech at Paris or what have you or maybe we need to do an executive customer review at Shell in London.

And so this is how it's organized. *I am fully engaged, managing every details of the business every day, as you know me a little bit and you know I'm generally in touch with those details. My health is excellent, okay? So beyond all of the infirmities that I had, I just can't see.*

30.     On May 28, 2025, Defendants published their fourth quarter and full-year fiscal 2025 results. During the corresponding earnings call, Defendant Siebel discussed the state of the market demand and potential for C3's business to grow, stating, in pertinent part:

Now let's look at where we are, the facts of the market in -- I'm sorry, May of 2025, okay? *We have a generally acknowledged, large and rapidly growing market. And we look at the AI stack and the companies that are playing at the bottom of the stack*. We have the silicon providers, the Intels, the AMDs, the NVIDIAs. Above that, we have the infrastructure providers, the Microsoft Azure, AWS, GCP, et cetera. On top of that, we have the people providing the foundation models like OpenAI and Anthropic, Facebook, et cetera. On top of that, we have the providers of many thousands of utilities that are out there that do things like platform independent, relational database persistence or key value stores or AutoML or virtualization or whatever it may be.

***

The result of this, we've experienced -- as a result of the kind of realization of this enterprise AI kind of reality, *we've seen enormous growth in our market*, again, in the last few years, going from 6% to 16% to 25%. *And our focus, if we look at Q3*

---

[1] Emphasis is added unless otherwise noted.

*and Q4 of fiscal year '25 has been building an ecosystem to be able to address this huge sucking sound that we hear out there, that is the demand for enterprise AI applications*. And in order to address these applications, we need an army of partners. And so *we have been focused in the last few quarters on establishing this army of strategic partners and enabling this army of strategic partners to be effective at communicating the benefits of these applications and selling these applications*.

\*\*\*

our revenue growth rate continues to exceed our expense growth rate. Fast math without the Excel spreadsheet. *It follows ipso facto, the cash possibility and non-GAAP profitability is simply a matter of scale*. And I expect in 2027 and beyond, we will cross that path into consistent cash positivity and an annualized non-GAAP profitability thereafter. So it was a great quarter, a great year. Customers are happy, products are excellent, market is huge. And if there is anybody else in the Enterprise AI applications business, I'm unaware of who they are.

31.     C3's Agentic AI was in accord, pertinently stating on the call:

And finally, we expect to see accelerating growth driven by the Generative AI and Agentic AI markets where our solutions are highly differentiated, highly beneficial and address a market opportunity that is incalculably large. The Enterprise AI landscape is at an inflection point and C3 AI stands ready to lead. The convergence of market demand and our proven capabilities creates a unique opportunity to drive sustained growth by combining best-in-class technology with a world-class network of partners and a relentless focus on customer value, we are poised to shape the future of business operations across industries. As we step into fiscal 2026, our path is clear. Our momentum is strong, and our commitment to delivering impactful AI solutions has never been greater.

32.     Defendant Lath then took over the prepared remarks to provide the Company's guidance for the first quarter and full year of fiscal 2026, stating:

Now I'll move on to our guidance for the next quarter. *Our revenue guidance for Q1 of fiscal '26 is $100 million to $109 million. For the full fiscal 2026, we are anticipating revenue in the range of $447.5 million to $484.5 million. Our guidance for non-GAAP loss from operations for the first quarter is $23.5 million to $33.5 million. And our non-GAAP loss from operations for the year, the guidance is $65 million to $100 million*. Our guidance is predicated on the assumption of geopolitical stability. Were there to be a situation that the U.S. government closed, the budget did not pass, or we see indications of global trade friction, given the reality of these market risks, those could have unknown and adverse consequences on our business results.

Last year, our revenue growth was 25% and our expenses grew by 18%. *As we approach fiscal '26, we expect the revenue growth rate to continue to exceed our*

- 7 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*expense growth rate. So profitability remains simply a matter of scale.* Our expectation is that we will cross into non-GAAP profitability during the second half of fiscal '27, and we expect to be free cash flow positive in the fourth quarter of fiscal '26 and in successive years thereafter.

33.    During the question-and-answer segment, Defendant Siebel highlighted his improving health and defended management's wider-than-typical full year guidance range during the following exchanges:

> **Citizens JMP Securities Analyst:** Wonderful. And then if I could ask a follow-up. With your permission, Tom, I hope this is okay. But in February, you informed us that you'd suffered a health setback and it was limiting your ability to travel and then you're going to have Jim Snabe help out, but I was delighted to hear on this call that you're -- I mean, you're probably not delighted to get out of red eye, but I was delighted to hear that you're getting on a red eye because that sounds like some positive development. So I don't know, any comments that you're okay sharing with us on that, I'm sure, would be greatly appreciated.

> **Defendant Siebel:** *I did get slowed down for a little bit. There's no question about it.* And I had -- it's very unlikely to work from home. You know that. And *I had to work from home for a little while and take it easy and recover*, but I will catch a red eye to Washington, D.C. tonight. I will be in Washington, D.C. again for 3 days, I think, 10 days from now after attending a wedding in Cabo. *So just when you thought it was safe, Pat, I'm back.*

***

> **Needham & Company Analyst:** […] looking at your FY '26 revenue guidance, the band of outcomes is considerably larger than what you've given in past quarters. How did you think through guidance construction this quarter? And what needs to happen to achieve the high end of that band versus the low end?

> **Defendant Siebel:** Well, we read the same newspaper that you guys read. And we do talk to the President, and I had dinner with the speaker of the house last night. I spoke with the leader of the Senate last week, and I'll meet -- and so we do know these people and we do read the newspaper. And we all know there is risk. There is risk in Europe. We have kinetic risk. We have geopolitical risk. We have risk -- we have budget risk of, in fact, the government even shutting down. And these are real. And we have companies out there that were withdrawing guidance altogether. And we thought in the interest of being -- we have to acknowledge that these risks are real. And so that results -- as a result, we have a broader range than usual to accommodate the unanticipated. And when we deal with these guys who are making America great again, they seem to hit us with the unanticipated quite frequently. So that's it. We're just acknowledging very real risk -- market risk that's out there. And should it go bad,

it's going to have an adverse effect on our business as it will, General Motors and everybody else in the world.

34.     On July 24, 2025, C3 issued a press release announcing that the Company "has initiated a search for Mr. Siebel's successor as Chief Executive Officer of C3 AI."

35.     Defendant Siebel was quoted in the release discussing his departure and assuring investors of his continued engagement in his current role until a successor is found, stating:

> After being diagnosed with an autoimmune disease in early 2025, I have experienced significant visual impairment . . . ***I will remain fully engaged as Chief Executive Officer of C3.ai until such time as the C3.ai board appoints my successor after which I will continue in the role of Executive Chairman focusing on strategy, product innovation, strategic partner and customer relationships***."

36.     The above-referenced statements were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk to the Company's profitability from Defendant Siebel's health concerns. In truth, C3's optimistic reports of growth, earnings potential, and anticipated margins fell short of reality as they relied far too heavily on the health and effectiveness of the Company's CEO.  Despite repeated assurances, Defendant Siebel had not sufficiently recovered from his ailments to act in the same capacity for C3 as he had previously.

## THE TRUTH EMERGES

37.     On August 8, 2025, the Company issued a press release announcing preliminary financial results for the first quarter of fiscal 2026, in pertinent part, as follows:

**Fiscal First Quarter 2026 Preliminary Business Update**

- Total revenue for the quarter was $70.2 million – $70.4 million.
- GAAP loss from operations was ($124.7) million – ($124.9) million.
- Non-GAAP loss from operations was ($57.7) million – ($57.9) million.
- $711.9 million in cash, cash equivalents, and marketable securities as of July 31, 2025.

38.     The same day, the Company issued a second press release announcing a restructuring of its sales and services organizations.  In the press release, Defendant Siebel spoke on the quarter's performance, stating:

The good news is we have completely restructured the sales and services organization, including new and highly experienced leadership across the board to ensure a return to accelerating growth and increased customer success at C3 AI. ***The bad news is that sales results in Q1 were completely unacceptable***. Having given this a lot of thought, I attribute this to two factors. ***One: It is clear that in the short term, the reorganization with new leadership had a disruptive effect. Two: As we have previously announced, I have had a number of health issues in the past six months including multiple hospitalizations and vision impairment. Unfortunately, dealing with these health issues prevented me from participating in the sales process as actively as I have in the past***. With the benefit of hindsight, ***it is now apparent that my active participation in the sales process may have had a greater impact than I previously thought.***

39.    The aforementioned press releases and statements made by the Company are in direct contrast to statements they made during the February 26 and May 28, 2025, earnings calls. On those calls, the Company continually praised high market demand for their products, continued growth, and repeatedly assured investors as to Defendant Siebel's health, while they simultaneously minimized the associated risks to the Company's ability to close deals and capitalize on its alleged growth potential.

40.    Investors and analysts reacted immediately to C3's revelation. The price of C3's common stock declined dramatically. From a closing market price of $22.13 per share on August 8, 2025, C3's stock price fell to $16.47 per share on August 11, 2025, a decline of about 25.58% in the span of just a single day.

41.    A number of well-known analysts who had been following C3, lowered their price targets in response to C3's disclosures. For example, Oppenheimer, while downgrading to market performance and altogether removing their price target highlighted the Company's "extremely weak preliminary 1Q26 results," pertinently noting C3 "significantly lowered revenue expectations for 1Q26, from ~$105M to ~$70M, implying a 35% sequential decline and a major concern given the recurring nature of its Subscription revenues, suggesting the services are not working as advertised."

42.    Similarly, Northland Capital Markets downgraded the stock, as C3's "preliminary results not only missed [their] revenue estimates, but also came in lower than [their] subscription estimates, which are supposed to be relatively visible on a quarterly basis."

43.     The fact that these analysts, and others, discussed C3's shortfall and below-expectation results suggest the public placed significant weight on C3's prior revenue and sales estimates. The frequent, in-depth discussion of C3's guidance confirms that Defendants' statements were material.

**Post-Events**

44.     In response, a number of well-known analysts who had been following C3 closely lowered their price targets.  For example, Oppenheimer, while downgrading to market performance and altogether removing their price target, highlighted the Company's "extremely weak preliminary 1Q26 results," noting C3 "significantly lowered revenue expectations for 1Q26, from ~$105M to ~$70M, implying a 35% sequential decline and a major concern given the recurring nature of its Subscription revenues, suggesting the services are not working as advertised."

45.     On September 6, 2025, the Company filed a Form 8-K with the SEC announcing that Defendant Siebel was officially stepping down as CEO of the Company and that the Board had "unanimously appointed Stephen Ehikian as the Company's Chief Executive Officer, effective September 1, 2025. Thomas M. Siebel will continue to be engaged as Executive Chairman."

## INSIDER TRADING

46.     Defendants Siebel, Lath, Levin, Ward and Sewell (collectively, the "Insider Selling Defendants"), used their knowledge of C3's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of C3, the Insider Selling Defendants were privy to material, nonpublic information about Defendant Siebel's ability to act in the same capacity as he previously had done and the Company's revenue outlook.

47.     While in possession of this material, non-public knowledge, Defendant Siebel sold 3,504,133 shares of his personally held C3 stock for proceeds of at least $81.7 million.  His sales were timed to maximize profit from C3's then artificially inflated stock price.

48.     While in possession of this material, non-public knowledge, Defendant Lath sold

28,097 shares of his personally held C3 stock for proceeds of at least $716,365. His sales were timed to maximize profit from C3's then artificially inflated stock price.

49.    While in possession of this material, non-public knowledge, Defendant Levin sold 42,000 shares of his personally held C3 stock for proceeds of at least $1.17 million. His sales were timed to maximize profit from C3's then artificially inflated stock price.

50.    While in possession of this material, non-public knowledge, Defendant Ward sold 42,382 shares of his personally held C3 stock for proceeds of at least $1.15 million. His sales were timed to maximize profit from C3's then artificially inflated stock price.

51.    While in possession of this material, non-public knowledge, Defendant Sewell sold 79 shares of his personally held C3 stock for proceeds of at least $2,054. His sales were timed to maximize profit from C3's then artificially inflated stock price.

52.    Accordingly, the Insider Selling Defendants collectively sold over **$84 million worth** of C3 stock at artificially inflated prices.

## DAMAGE TO THE COMPANY

**Securities Class Action**

53.    On January 22, 2024, a securities class action complaint was filed in the United States District Court for the Northern District of California against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 in the case captioned: *Liggett v. C3.AI, Inc., et al.*, Case No. 3:25-cv-07129 (N.D. Cal.) ("Securities Class Action").

54.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Unjust Compensation**

55.    At all relevant times, the Company paid lucrative compensation to each of the

Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

56.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

57.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Insider Trading**

58.    As alleged above, the Insider Selling Defendants, while in possession of material, non-public information, collectively abused their positions as Company insiders, misappropriated the Company's valuable information, and ***reaped over $84 million in gross proceeds*** through their unlawful insider trading which the Company is entitled to disgorge.

**Additional Damage to the Company**

59.    As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars.

60.    Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

61.    In addition, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

62.     As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## CORPORATE GOVERNANCE

63.     Board members are held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

64.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of C3, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

65.     C3's Code of Conduct states that it "addresses the conduct of C3 AI employees, officers and directors."

66.     In a section entitled "Honest and Ethical Conduct," the Code of Conduct states:

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. C3 AI's integrity and reputation depend on the fairness and integrity brought to the job by each person associated with us. Personal integrity and sound judgment are the foundation of C3 AI's corporate integrity.

67.     In a section entitled "Legal Compliance," the Code of Conduct states:

Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their business units and areas of responsibility and to be familiar with and comply with other C3 AI policies relating to legal compliance, including C3 AI's Anti-Corruption Policy and Insider Trading Policy. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as C3 AI, to civil and/or criminal penalties, and may be grounds for disciplinary action, up to and including termination of employment.

68.     In a section entitled "Insider Trading," the Code of Conduct states:

Employees, officers and directors who have access to material, nonpublic (or "inside") information are not permitted to use or share that information for stock trading purposes. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is illegal. Please refer to C3 AI's Insider Trading Policy for more detailed information.

69.     With respect to "Conflicts of Interest," the Code of Conduct states:

C3 AI expects its employees, officers and directors to be free from influences that conflict with the best interests of C3 AI or might deprive C3 AI of their undivided loyalty in business dealings. Making judgments, taking decisions, or pursuing actions when facing a conflict of interest may make it difficult to perform duties objectively and effectively and may have legal or regulatory consequences. Employees, officers and directors should avoid situations where their personal interests (financial or otherwise) may conflict with or compromise C3 AI's interest, could potentially result in a conflict of interest or could otherwise have the appearance of impropriety.

While it is not possible to list all potential conflicts of interest, some of the more common conflicts would include: (a) outside employment, consulting, or board service; (b) holding a financial or other interest in a customer, vendor or partner of C3 AI, an entity seeking to do business with us or a competitor; or (c) soliciting or accepting gifts, favors, loans or preferential treatment from any person or entity that does business or seeks to do business with us. Additional detail on each of these potential conflicts of interest—as well as other areas of potential concern—may be found in the C3 AI Employee Handbook.

70.     In section entitled "Financial Integrity," the Code of Conduct states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others. We also rely upon our accounting and other business and corporate records in preparing publicly filed reports. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is complete, accurate and transparent. If you have any concerns about how to comply with this policy, or if you observe conduct or actions that do not seem to comply with this policy, you should immediately discuss such concerns with the General Counsel.

**Audit Committee Charter**

71.     At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee.  Pursuant to C3's Audit Committee Charter, the purpose of the Audit Committee is to:

- oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

- oversee the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

- maintain and foster an open avenue of communication with the Company's management, and Auditors;

- review any reports or disclosures required by applicable law and stock exchange listing requirements; help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- provide regular reports and information to the Board.

72.     The Audit Committee Charter also sets forth the additional duties and responsibilities of the Audit Committee:

***Financial Review and Disclosure:***

[]. **Annual Audit Results**. The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;

- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

- all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and • any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

[]. **Audited Financial Statement Review; Quarterly and Annual Reports**. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

[]. **Proxy Report**. After the Public Effective Date, the Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

[]. **Accounting Principles and Policies**. The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

- critical accounting policies and practices;

- alternative accounting policies available under GAAP;

- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

- any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter, and monitor management's response to such communications. The Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB) on at least an annual basis, to the extent required by such rules.

[]. **Management Cooperation with Audit**. The Committee will evaluate management's cooperation with the Auditors during their audit examination, and expect disclosure of any significant difficulties or disagreements encountered during the audit, if any.

*Internal Control and Procedures*:

[]. **Risk Assessment and Management**. The Committee will review and discuss with management and the Auditors the Company's processes and policies on risk identification, management and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to information security, competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks. The Committee shall review and approve as appropriate the Company's decision to enter into swaps or other derivative transactions that are exempt from exchange-execution and clearance under "end-user exception" regulations established by the Commodity Futures Trading Commission, and to review and discuss with management the Company's Foreign Exchange Policy, including the Company's use of swaps.

[]. **Internal Control over Financial Reporting; Disclosure Controls**. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and, to the extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

[]. **Correspondence with Regulators**. The Committee will consider and review with management, the Auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

[]. **Internal Control Report**. At least annually (if required by applicable stock exchange listing requirements) or as may otherwise be determined by the Committee, the Committee will review a report by the Auditors describing its internal quality-control procedures and any material issues raised by (a) that firm's internal quality-control review, (b) any peer review of the firm's internal quality-control procedures or review, or (c) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the Auditors. . . .

*Other Matters*

[]. **Other Legal and Finance Matters**. The Committee will review with management

legal and regulatory compliance and any actual, pending or threatened legal or financial matters that could significantly affect the Company's business or financial statements or as otherwise deemed appropriate by the Committee.

## DUTIES OF THE DIRECTOR DEFENDANTS

73.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

74.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

75.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

76.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

77.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

78.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and

officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

79.      The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.      Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

81.      Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

82.      Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

83.      Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

84.      At the time this suit was filed, the Company's Board was comprised of twelve (12) members comprised of Defendants Siebel, Rice, Levin, McCaffery, Sewell, Davis, Snabe, Ward, Sridhar, Murray, Hyten and Goldman ("Director Defendants").  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective

judgment about whether to bring this action or whether to vigorously prosecute this action.

85.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

## DEMAND IS FUTILE AS
## DEFENDANT SIEBEL CONTROLS THE BOARD

86.    The Director Defendants each lack independence from and are all beholden to Defendant Siebel, who holds immense power at the Company and directly oversees all aspects of the Company's operations and strategy.

87.    Aas the Company's controlling shareholder with over 50% of voting power, Defendant Siebel has the power to single-handedly determine the outcome of a shareholder vote, including the re-election of the Director Defendants.

88.    Demand on the Director Defendants is futile because the Company's CEO and only employee-director, Defendant Siebel, wields such overwhelming influence and control within the Company that these purportedly independent directors are neither disinterested nor capable of exercising independent business judgment with respect to the claims asserted herein.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

**Demand is Excused Because the Director Defendants Lack Independence**

89.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

90.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation

91.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

92.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

93.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

94.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

95.    Further, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

96.    Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Siebel**

97.    Defendant Siebel is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Siebel cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

98.    As CEO, Defendant Siebel also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement.  As such, Defendant Siebel could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Siebel is therefore futile.

99.    Defendant Siebel also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Siebel is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

100.    In addition, Defendant Siebel receives lucrative compensation in connection with his employment with the Company. Defendant Siebel is not independent from Defendants Sewell, Ward, and Sridhar as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Siebel. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives,

Defendant Siebel could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

101.    Because of Defendant Siebel's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Siebel is unable to comply with his fiduciary duties and prosecute this action. Defendant Siebel is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendants Snabe and Hyten**

102.    Defendants Snabe and Hyten are not independent or disinterested directors, as admitted by the 2025 Proxy Statement, because they previously served as Special Advisors to the CEO. As such, not only are Defendants Snabe and Hyten beholden to Defendant Siebel through their prior employment, but undoubtedly have a close relationship built upon mutual respect with Defendant Siebel making them incapable of objectively considering a demand to sue.

**The Insider Selling Directors**

103.    As alleged above, Defendants Siebel, Levin, Ward, Sewell and Hyten (the "Insider Selling Directors") each sold copious amounts of their personally held common stock while in possession of material, non-public information.  Each of the Insider Selling Directors' sales were timed to maximize profit from the Company's artificially inflated stock price. Accordingly, each of the Insider Selling Directors face a substantial likelihood of liability for their unlawful insider trading and further obtained a material personal benefit from their insider trading.

104.    Because each of the Insider Selling Directors face a substantial likelihood of liability and reaped a material personal benefit from their unlawful insider trading, none of them can reasonably consider a demand to sue each other. Nor could the Insider Selling Directors reasonably investigate the insider sales committed by Defendant Lath without bringing attention to their own unlawful insider sales. As such, demand is excused as to each of the Insider Selling Directors.

///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Defendant Sridhar**

105.    Defendant Sridhar is irreconcilably conflicted and could not consider a demand to sue because of his role as CEO of Bloom Energy Corporation, a related party of the Company. Indeed, the 2025 Proxy Statement states the following:

> KR Sridhar is a member of our board of directors and the Chief Executive Officer of Bloom Energy Corporation ("Bloom Energy"). On July 25, 2024, we entered into a commercial agreement with Bloom Energy of $350,000. On January 31, 2025, we entered into an additional commercial agreement with Bloom Energy of $1.90 million. These commercial agreements with Bloom Energy were negotiated in the ordinary course of business and on terms that are comparable to the terms available to an unrelated third party. Pursuant to these commercial agreements with Bloom Energy, during the fiscal year ended April 30, 2025, we recognized subscription revenue of $797,000, and professional services revenue of $830,000.

> In October 2024, the Company entered into a sublease and related services agreement (the "Sublease Agreement") with Bloom Energy, whereby the Company agreed to sublease office space located in Davos, Switzerland (the "Subleased Space") and provide support and vendor services, at cost, related to the Subleased Space. Under this Sublease Agreement, Bloom Energy paid us approximately $137,000, during the fiscal year ended April 30, 2025.

106.    As such, Defendant Sridhar is unable to consider a demand which, in turn, could have an adverse impact on the business relationship between the Company and Bloom.

**Defendants Levin, McCaffery, Davies and Goldman**

107.    Defendants Levin, McCaffery, Davies and Goldman, as members of the Audit Committee, reviewed and approved the improper statements. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, Defendants Levin, McCaffery, Davies and Goldman were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.

108.    Moreover, Defendants Levin, McCaffery, Davies and Goldman reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, Defendants Levin, McCaffery, Davies and Goldman caused these improper statements. Accordingly, Defendants Levin, McCaffery, Davies and Goldman breached their fiduciary duty of

loyalty because they participated in the wrongdoing described herein. Thus, Defendants Levin, McCaffery, Davies and Goldman face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Additional Reasons Demand is Futile**

109.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

110.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

111.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

112.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their

positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

113.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

114.    Publicly traded companies, such as C3, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

115.    Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Against the Individual Defendants for Breach of Fiduciary Duties)

116.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

117.    The Individual Defendants owe the Company fiduciary obligations.  By reason of

their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

118.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

119.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to disclose that: (i) Defendant Siebel was suffering from health issues, which was negatively impacting the Company's ability to close deals; (ii) the Company's management was unable to minimize the negative impact on C3 AI; (iii) as a result, the Company could not execute its profit and growth projections; (iv) the Company failed to maintain adequate internal controls; and (v) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

120.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

121.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

### SECOND CAUSE OF ACTION
### (Against the Individual Defendants for Gross Mismanagement)

122.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

123.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

124.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

125.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION
### (Against the Individual Defendants for Waste of Corporate Assets)

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

128.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions.

129.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION
### (Against the Individual Defendants for Unjust Enrichment)

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

132.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

133.    Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

### FIFTH CAUSE OF ACTION
### (Against the Director Defendants for Aiding and Abetting)

134.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

136.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

137.    As a result, the Director Defendants substantially assisted the Officer Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

138.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

139.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## SIXTH CAUSE OF ACTION
### (Against the Insider Selling Defendants for Insider Trading)

140.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

141.    By reason of their fiduciary role as officers and directors of the Company, the Insider Selling Defendants specifically owed the Company the highest obligation of due care, good faith, and loyalty.

142.    As directors and/or officers of the Company, the Insider Selling Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

143.    When the Insider Selling Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information for collective gross proceeds *in excess of $84 million*.

144.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold holdings in Company stock.  The Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

145.    As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.     Awarding, against the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, unjust enrichment, and waste of corporate assets;

B.     Awarding, against the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants aiding and abetting;

C.     Awarding, against the Insider Selling Defendants and in favor of the Company, disgorgement of all illicitly gained proceeds from the Insider Selling Defendants' unlawful insider trading;

D.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 10, 2025                Respectfully submitted,

**CLAYEO C. ARNOLD**
**A PROFESSIONAL CORPORATION**

By:  */s/ M. Anderson Berry*
     M. Anderson Berry (SBN 262879)
     Gregory Haroutunian (SBN 330263)
     Brandon P. Jack (SBN 325584)
     **CLAYEO C. ARNOLD**
     **A PROFESSIONAL CORPORATION**
     865 Howe Avenue
     Sacramento, CA 95825
     Telephone: (916) 239-4778
     *aberry@justice4you.com*
     *gharoutunian@justice4you.com*
     *bjack@justice4you.com*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thomas J. McKenna*
*tjmckenna@gme-law.com*
Gregory M. Egleston*
*gegleston@gme-law.com*
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300

*\*Pro Hac Vice Forthcoming*

***Attorneys for Plaintiff***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

 I, JOSEPH FERNICOLA, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of C3.AI, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of C3.AI, Inc. common stock at all relevant times.


*Joseph Fernicola*
JOSEPH FERNICOLA